# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EDWIN CHARLES KRELL, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO. JKB-18-637 |
| QUEEN ANNE'S COUNTY, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Edwin Krell ("Plaintiff") filed a twelve-count complaint against Queen Anne's County ("the County") and nine state and local officials seeking monetary damages stemming from his alleged unlawful arrest in 2015. The counts include five federal claims brought under 42 U.S.C. § 1983 and seven claims arising under Maryland law. Pending before the Court is a motion to dismiss filed by Maryland State Police Trooper Sargent Tyson Brice and Trooper First Class Kyle Braightmeyer ("State Defendants").[1] Also before the Court is a motion to dismiss and bifurcate filed by the County, Sheriff Gary Hofmann, Warden LaMonte Cooke of Queen Anne's

---

[1] State Defendants alternatively move for summary judgment, in support of which they proffer several documents. "A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure," *Sager v. Hous. Comm'n*, 855 F. Supp. 2d 524, 542 (D. Md. 2012), which provides that "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," Fed. R. Civ. P. 12(d). "Nevertheless, a district judge has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings . . . or to reject it or simply not consider it.'" *Sager*, 855 F. Supp. 2d at 542 (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2004)). Where, as here, Plaintiff has had no opportunity to undertake discovery, the Court is loath to force Plaintiff into a summary-judgment posture. *Cf. Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) ("Generally speaking, 'summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)); *Minter v. Wells Fargo Bank, N.A.*, 593 F. Supp. 2d 788, 792 (D. Md. 2009) ("As a general rule, summary judgment is not appropriate prior to the completion of discovery."). The Court will decline to exercise its discretion under Rule 12(d) and will instead evaluate State Defendants' motion under Rules 12(b)(1) and 12(b)(6), excising the proffered documents from its consideration.

County Detention Center, Corrections Officer Duckery, and Corrections Officer Crabtree ("County Defendants").[2] Corrections Officer Marcie Hamifee separately moves to dismiss and bifurcate. The motions have been fully briefed, and no hearing is required, Local Rule 105.6 (D. Md. 2016).

For the reasons set forth below, the Court will grant in part and deny in part the State Defendants' motion and County Defendants' motion, and it will grant Officer Hamifee's motion entirely.

## I.   *Allegations of the Complaint*

At the motion to dismiss stage, the Court takes the allegations of the complaint as true, *see, e.g.*, *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997), and construes any disputed allegations in the light most favorable to the plaintiff, *In re Royal Ahold N.V. Secs. & ERISA Litig.*, 351 F. Supp. 2d 334, 376 n.32 (D. Md. 2004) ("[R]esolution of [a] factual dispute is inappropriate when ruling on a motion to dismiss . . . ."). Here, the Court summarizes Plaintiff's allegations.

On March 3, 2015, at approximately 9:00 a.m., law enforcement officers of the County Drug Task Force arrested Plaintiff. (Compl. ¶ 23, ECF No. 1.) The arrest occurred in Plaintiff's Chestertown home where he resides with his male partner. (*Id.* ¶ 31.) As a result of rotator cuff surgery in 2009, Plaintiff's ability to reach his right arm behind his back was limited, but he experienced no pain or other limitations. (*Id.* ¶ 51.) At the time of the arrest, Plaintiff was wearing nothing but boxer shorts; as such, injuries to his upper body, like his shoulder, would have been visible. (*Id.* ¶ 24, 28.)

---

[2]     For purposes of this Opinion, the Court groups Sheriff Hofmann with the County Defendants because the County Defendants include Sheriff Hofmann in their motion to dismiss; however, the question of whether a sheriff is a state or county official depends on the nature of the allegations against the sheriff. *See* note 6, *infra*.

That morning, Plaintiff saw the officers approaching his home, and, before they entered, he got down on his knees and placed his hands behind his head. (*Id.* ¶ 24.) Plaintiff's pet Chihuahua was "agitated" so Plaintiff lowered his hands to calm the dog. (*Id.* ¶ 25.) One of the law enforcement officers, later identified as Defendant State Trooper Braightmeyer, grabbed Plaintiff's arm and twisted it behind his back; then, he shoved Plaintiff's face to the floor so that Plaintiff's face cracked a floor tile. (*Id.* ¶ 25–26.) Braightmeyer placed his boot on Plaintiff's neck. (*Id.* ¶ 26.) Braightmeyer handcuffed Plaintiff and pulled him up by the handcuffs, pushing him into a chair. (*Id.* ¶ 27.) Plaintiff screamed in pain and lost feeling in his right arm. (*Id.*)

Defendant State Trooper Brice noticed that Plaintiff was injured and asked Braightmeyer to handcuff Plaintiff in front of his body, but Braightmeyer responded, "This faggot is staying handcuffed just like this. I'm sticking to protocol." (*Id.* ¶ 29.) Braightmeyer continued to call him a "faggot" and curse at him. (*Id.* ¶ 30.) Plaintiff alleges that none of the officers chose to touch him after Braightmeyer made these derogatory comments. (*Id.* ¶ 29.)

Between his arrest at 9:00 a.m. and his arrival at the County's detention center at 5:00 p.m., Plaintiff constantly complained to Braightmeyer of the pain and loss of feeling in his right arm. (*Id.* ¶ 33–34.) The officers searched Plaintiff's home for about an hour before transporting Plaintiff to the Police Centreville Barracks, the District Court Commissioner, and the detention center. (*Id.* ¶ 32, 34.) At one point, Braightmeyer hiked the handcuffs up Plaintiff's arm toward his shoulder, and Plaintiff screamed in pain and requested medical attention. (*Id.* ¶ 33.)

At the detention center, Plaintiff told corrections officers that he needed medical attention. Upon arrival, Plaintiff told an unidentified corrections officer that his shoulder was dislocated, that he was in pain, that he had lost feeling in his right arm, and that he required

medical care, to which the officer replied, "We'll tell medical." (*Id.* ¶ 35.) The next day, a district court judge conducted Plaintiff's video bail review hearing, during which Plaintiff requested medical attention. (*Id.* ¶ 37.) Warden Cooke was present at the hearing and asked the unidentified corrections officers why they had not taken Plaintiff to see a doctor. (*Id.* ¶ 37.)

Plaintiff received medical attention three days after his arrest. On March 6, Officer Duckery and another corrections officer took Plaintiff to the University of Maryland emergency care facility, where staff members were unable to fix Plaintiff's dislocated shoulder. (*Id.* ¶ 38–39.) The two officers then took Plaintiff to the Shock Trauma Center, where staff members stabilized Plaintiff's shoulder and said that he needed immediate surgery—certainly, within the next two days. (*Id.* ¶ 39–41.) Both, or one of, the two officers told Warden Cooke that Plaintiff needed surgery in the next two days. (*Id.* ¶ 41–42.) Plaintiff was returned to the detention center, and, despite repeatedly asking when he would undergo surgery, he did not see a doctor until March 23, at which time the orthopedic surgeon confirmed that Plaintiff should have had surgery two weeks earlier. (*Id.* ¶ 43–44.) While on pretrial release, Plaintiff resumed treatment with the orthopedic surgeon, who operated on Plaintiff in August 2015. (*Id.* ¶ 45–46.)

Plaintiff was sentenced in November 2015 and incarcerated until the end of January 2016 when the center released him to home detention. (*Id.* ¶ 47–49.) On January 3, 2016, the orthopedic surgeon wrote a letter to the detention center, stating that Plaintiff needed physical therapy three to five times a week and an evaluation by a neurosurgeon. (*Id.* ¶ 48.) Plaintiff alleges that, nearly every day, he filed written grievances with the center requesting physical therapy and an evaluation by a neurosurgeon. (*Id.*) The center never provided the requested medical attention. (*Id.*) After Plaintiff's release, he was unable to begin physical therapy for

some time because the detention center was billing Plaintiff's insurance for his treatment while at the center.  (*Id.* ¶ 50.)

Since Plaintiff's arrest, he has experienced and complained of constant pain.  (*Id.* ¶ 52.) Plaintiff alleges that he has difficulty sleeping; that he has had to train himself to use his left hand; that he has undergone additional surgeries, causing further scarring and disfigurement; and that he is more susceptible to injury.  (*Id.* ¶ 52–54.)  Although Plaintiff had no psychological issues before his arrest, he has become suicidal due to his pain and has undergone three psychiatric hospitalizations.  (*Id.* ¶ 55.)

On March 2, 2018, Plaintiff filed this law suit, alleging twelve counts against ten defendants.  Eight of the defendants move to dismiss all twelve counts.[3]

## II.    *Standard of Review*

### A.  *Rule 12(b)(6)*

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a plaintiff's complaint.  *Presley v. Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A complaint need only satisfy Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss, the plaintiff must allege sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility exists where the facts allow the court to reasonably infer that the defendant is liable for the alleged misconduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But, inferring the "mere possibility of misconduct" is not enough to establish a plausible claim.  *Id.* at 679. Moreover, a complaint offering "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

---

[3]    The two defendants that have not moved to dismiss are identified only as Officers John Doe #1 and #2.

**B. Rule 12(b)(1)**

To the extent that defendants raise the defense of Eleventh Amendment sovereign immunity, this Court reviews that defense under Federal Rule of Civil Procedure 12(b)(1). The Fourth Circuit has not decided whether sovereign immunity is grounds for dismissal for failure to state a claim under Rule 12(b)(6) or for lack of subject matter jurisdiction under Rule 12(b)(1), but this Court favors analysis under Rule 12(b)(1) because immunity functions "as a block on the exercise of that jurisdiction." *Gross v. Morgan State Univ.*, 308 F. Supp. 3d 861, 865 (D. Md. 2018) (quoting *Biggs v. Meadows*, 66 F.3d 56, 60 (4th Cir. 1995)). "A motion to dismiss based on lack of subject matter jurisdiction pursuant to [Rule 12(b)(1)] raises the question of whether the court has the competence or authority to hear the case. *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). The plaintiff bears the burden of establishing subject matter jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *see also Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (noting challenge may be either facial, i.e., complaint fails to allege facts upon which subject matter jurisdiction can be based, or factual, i.e., jurisdictional allegations of complaint are not true). Where defendants raise the defense of sovereign immunity, they make a facial challenge to the complaint. *See, e.g.*, *Weiss v. Price*, Civ. No. ELH-17-1127, 2018 WL 1156770, at *2 (D. Md. March 5, 2018); *Downing v. Balt. City Bd. of School Comm'rs*, Civ. No. RDB-12-1047, 2012 WL 6615017, at *3 (D. Md. Dec. 18, 2012). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192.

**III. Analysis**

This Court evaluates the sufficiency of Plaintiff's complaint in light of the three motions to dismiss. The Court groups the Defendants' arguments by motion, but, for clarity and efficiency, the Court sometimes analyzes the arguments from one motion together with arguments from another. After viewing the allegations in the light most favorable to the Plaintiff and examining each argument as to those allegations, the Court concludes that several counts survive the motions to dismiss as to the State Defendants and Warden Cooke.

### A. State Defendants' Motion to Dismiss

Plaintiff asserts three federal claims against the State Defendants. He alleges they violated the Fourth and Fourteenth Amendments when they arrested him by using excessive force and showing deliberate indifference to his serious medical needs (Counts 1 and 2). Plaintiff alleges Braightmeyer violated the Fourteenth Amendment's Equal Protection Clause by discriminating against Plaintiff on the basis of his sexual orientation (Count 4). Plaintiff asserts seven state claims. Plaintiff alleges the State Defendants used excessive force in violation of Articles 24 and 26 of the Maryland Constitution (Count 6) and that they subjected him to cruel and unusual punishment in violation of Articles 16 and 25 of the Maryland Constitution (Count 7). Plaintiff alleges they engaged in a pattern and practice of unconstitutional conduct (Count 8). Plaintiff alleges that they were negligent and grossly negligent, and inflicted emotional distress on Plaintiff (Counts 9, 10, and 11). Plaintiff also asserts a battery claim against Braightmeyer (Count 12).

State Defendants move to dismiss. (State Mot. Dismiss, ECF No. 20.) They argue that all official capacity claims must be dismissed. (State Mot. Dismiss Mem. at 39–40, ECF No. 20-1.) They argue that Plaintiff fails to state a claim on each § 1983 count, asserting: they used reasonable force during the arrest, (*id.* at 8); they were not deliberately indifferent to a serious

medical need, (*id.* at 15–17); and they had neither the intent to discriminate nor effect of discriminating on the basis of sexual orientation, (*id.* at 26–28). For the § 1983 claims, State Defendants assert they are entitled to qualified immunity because the allegations do not establish a constitutional violation and, even if they did, the conduct did not violate any right that was clearly established by law. (*Id.* at 17–22, 29.) For the state law claims, they argue Plaintiff failed to state claims for relief, and they assert failure of notice and Maryland statutory immunity. (*Id.* at 30–38.)

The Court will deny Defendant State Troopers' motion to dismiss as to Counts 1, 2, 4, 6, 7, 9, 10, 11, and 12 and grant the motion as to Count 8, dismissing only that count.

### 1. Section 1983 Claims

To state a § 1983 claim, a plaintiff must allege that (1) a person acting under color of state law committed the conduct complained of, and (2) the conduct deprived the plaintiff of rights secured by the laws of the United States or the Constitution. *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 719 (4th Cir. 1991). "A defendant need not be the *sole* cause of the harm suffered by the plaintiff. Rather, a person may be held liable under § 1983 'if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation.'" *Artiga Carrero v. Farrelly*, 270 F. Supp. 3d 851, 863 (D. Md. 2017) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

### i. Bystander Liability

The first issue is whether Brice may be liable for actions taken by Braightmeyer, whose conduct constitutes most of the complaint's allegations. The fact that the complaint does not mention bystander liability or its elements does not mean Plaintiff has not alleged it. *See Stevenson v. Seat Pleasant*, 743 F.3d 411, (4th Cir. 2014) (affirming district court's conclusion

that plaintiff sufficiently pleaded bystander liability even though the complaint did not contain the term "bystander liability" or its elements). The question is whether the complaint alleges facts to establish Brice's bystander liability.

"The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002). Bystander liability applies to Maryland police officers, like Brice. *Thompson v. Virginia*, 878 F.3d 89, 109–10 (4th Cir. 2017) (citing *Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002)). Under the theory, a nearby officer is liable if the officer "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly." *Randall*, 302 F.3d at 203. Plaintiff alleges each element. Plaintiff alleges Brice witnessed Braightmeyer's arrest of Plaintiff. (Compl. ¶ 29.) *Cf. Smith v. Ray*, 409 F. App'x 641, 649 (4th Cir. 2011) (holding that officers who were not at the scene of the constitutional violation could not be liable under bystander liability). As a fellow officer, Brice possessed the power to intervene and even commented that Braightmeyer should adjust Plaintiff's handcuffs. (*Id.*) Brice chose not to act.

Because "[o]fficers have an affirmative duty to intervene to protect citizens' constitutional rights," *Randall*, 302 F.3d at 203, Brice's failure to act exposes him to liability. If Braightmeyer violated the constitution, Brice—under a bystander theory of liability—did too.

### ii.    *Sovereign Immunity*

The Court turns first to the State Defendants' defense of sovereign immunity. They argue they are entitled to sovereign immunity and, consequently, any official capacity claims

against them should be dismissed because they are not "final policy makers" within the Maryland State Police. (State Mot. Dismiss Mem. at 39–40.)

Under the Eleventh Amendment, a state, its agencies, and its departments are immune from suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation omitted). State troopers are state officials. *See, e.g.*, *In re Mills*, 287 F. App'x 273, 275 (4th Cir. 2008); *Swagler v. Harford Cnty.*, Civ. No. RDB-08-2289, 2009 WL 10682452, at *8 (D. Md. June 29, 2009). Here, the State Defendants are entitled to sovereign immunity.

"[O]fficial capacity claims are barred to the extent they seek monetary damages since the State's Eleventh Amendment immunity extends to state officials sued in their official capacities." *Swagler*, 2009 WL 10682452, at *8; *cf. St. Louis v. Praprotnik*, 485 U.S. 112, 121–22 (1988) (stating, even where plaintiff has sought injunctive relief, defendants can be liable in their official capacities "only when an injury was inflicted by a government's lawmakers or by those whose edicts or acts may fairly be said to represent official policy"). Because Plaintiff seeks monetary relief, any claims against State Defendants in their official capacity must be dismissed. Accordingly, this Court dismisses pursuant to Rule 12(b)(1) all official capacity claims against State Defendants (Counts 1, 2, and 4). The Eleventh Amendment does not bar suit against state officials in their individual capacity; thus, those claims remain.

### iii. *Qualified Immunity*

State Defendants also argue they are entitled to qualified immunity for any claims against them in their individual capacity. (State Mot. Dismiss Mem. at 17–23, 29.) State officials

performing discretionary duties may raise qualified immunity to shield themselves "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *In re Mills*, 287 F. App'x at 280 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "It is a defendant's burden to establish that he is entitled to qualified immunity." *Campbell v. Moore*, 92 F. App'x 29, 33 (3d Cir. 2004). Where qualified immunity is raised at the motion to dismiss stage, "the defense faces a formidable hurdle" and "is usually not successful" because 12(b)(6) only requires a plaintiff to state a plausible claim. *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 396 (4th Cir. 2014) (quoting *Field Day, LLC v. Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)). Qualified immunity involves two prongs: (1) whether the facts alleged or shown establish a violation of a constitutional right; and (2) whether the right was clearly established at the time of the challenged conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). This Court analyzes each § 1983 claim to determine whether Plaintiff sufficiently stated violations of constitutional rights and whether those rights were clearly established by law.

         **iv.**    ***Violation of a Constitutional Right (analyzed here for purposes of the first prong of qualified immunity <u>and</u> Rule 12(b)(6))***

In analyzing whether Plaintiff stated a violation of a constitutional right, the Court simultaneously determines whether Plaintiff sufficiently pleaded a constitutional violation pursuant to Rule 12(b)(6).

         **a.**  ***Excessive Force in Violation of the Fourth Amendment***

A claim of excessive force during the course of an arrest is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). The right to make a stop or arrest necessarily involves the right to use some degree of physical force so "[t]he question is whether the officers' actions are 'objectively reasonable'

in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396–97. A court analyzes several factors to determine objective reasonableness, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The extent of the plaintiff's injury is also a relevant consideration." *Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003) (quoting *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003)). Examining this case in light of the factors, the Court concludes Plaintiff has stated a plausible claim that State Defendants violated his constitutional right.

The first factor is the severity of the crime at issue, meaning whether the crime would lead officers to believe the arrestee was "a potentially dangerous individual." *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015); *see Young v. Los Angeles*, 655 F.3d 1156, 1165 n.8 (9th Cir. 2011) (asking "whether a given offense indicates a suspect's potential dangerousness, immediate or otherwise, such that there is a heightened social interest in the use of force to apprehend or subdue that suspect"); *see, e.g.*, *Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) (concluding that, unlike robbery or assault, drinking while intoxicated was not an offense indicating that a suspect would pose a danger to arresting officers). Here, Plaintiff was under arrest for distributing drugs. (Compl. ¶ 23.) This factor does not weigh strongly one way or the other because a drug offense may sometimes indicate an individual is armed and dangerous, but sometimes not.

The second and third factors more clearly weigh in Plaintiff's favor. Plaintiff did not pose an immediate threat to officers. *See Barfield v. Kershaw Cnty. Sheriff's Office*, 638 F. App'x 196, 202 (4th Cir. 2016) (weighing second factor in plaintiff's favor because there was no indication that he was armed or that he made threats). Plaintiff put his hands behind his head and

crouched on the floor, in his boxer shorts, a position from which he likely could not conceal a weapon. (Compl. ¶ 24.) Such a position also indicated that Plaintiff was not a flight risk. *See Barfield*, 638 F. App'x at 202 ("Barfield's walking *toward* the police car implies the opposite of a flight risk or an attempt to evade arrest . . . .) At most, Plaintiff moved from his sedentary position to calm his dog. (Compl. ¶ 25.) Meanwhile, multiple officers were searching Plaintiff's house, so the officers had backup, (*id.* ¶ 29) diminishing the possibility that Plaintiff constituted a threat or flight risk.

Finally, Plaintiff suffered a serious injury to his shoulder. *See Smith*, 781 F.3d at 99 (noting that excessive force resulted in visible bruising and broken ribs); *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994) (denying officer summary judgment on excessive force claim where officer observed plaintiff pick up $5 off the ground and arrested plaintiff, punching him, pushing him down, wrenching his knee, and, ultimately, tearing his anterior cruciate ligament); *cf. Barfield*, 638 F. App'x at 202–03 (holding that excessive force was used even though plaintiff did not suffer an injury). Here, Braightmeyer dislocated Plaintiff's shoulder. (Compl. ¶ 35.) Plaintiff screamed in pain, and his injury was visible to Brice and, subsequently, to Warden Cooke. (*Id.* ¶ 29, 37) His shoulder injury required both immediate care, (*id.* ¶ 38–42) and long-term treatment, (*id.* ¶ 41–46). Plaintiff also alleges psychological trauma as a result of the arrest. (*Id.* ¶ 55.)

Plaintiff alleges the State Defendants applied disproportionate force in light of the circumstances. Plaintiff was compliant. *See Smith*, 781 F.3d at 99 (holding use of force— grabbing arm, throwing to ground, jamming knee into spine, and wrenching arm behind back— was excessive because arrestee answered officer's questions calmly until he grabbed her arm); *cf. Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (holding the "minimal level of force"

justified because arrestee "had already disobeyed one direct order"). Given Plaintiff's compliance and the number of police resources at the officer's disposal, Braightmeyer was not justified in slamming Plaintiff's face into the floor tiles, wrenching his arm until his shoulder dislocated, and leaving his shoulder in a dislocated state for eight hours. Plaintiff has alleged Brice's presence at the scene of the arrest and Brice's knowledge of the alleged constitutional violation; therefore, Plaintiff has alleged bystander liability. Consequently, Plaintiff sufficiently alleges that State Defendants used excessive force in violation of the Fourth Amendment.

### b. Excessive Force in Violation of the Fourteenth Amendment

In addition to alleging that State Defendants used excessive force in violation of the Fourth Amendment, Plaintiff appears to allege that they used excessive force in violation of the Fourteenth Amendment Due Process Clause. In Plaintiff's opposition, he supports this due process argument with cases preceding *Graham*. (Pl. Opp. State Mot. Dismiss at 14, ECF No. 23.) *Graham* made clear that the Fourth Amendment "objective reasonableness" standard (rather than the Fourteenth Amendment "shocks the conscience" standard) governs claims of excessive force during an arrest. 490 U.S. at 393–94. Plaintiff does not allege any facts relating to excessive force outside the arrest context. To the extent Plaintiff tries to claim excessive force in violation of the Fourteenth Amendment, he fails to do so.

### c. Deliberate Indifference to Serious Medical Need in Violation of the Fourteenth Amendment

Under the Fourteenth Amendment, government officials must not be deliberately indifferent to the serious medical needs of pretrial detainees, *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) (concluding Fourteenth Amendment requires that government officials attend to pretrial detainees' serious medical needs), including arrestees, *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (evaluating due process claim where plaintiff died in transit after an arrest). In general, only government conduct that shocks the conscience violates the Fourteenth Amendment. *Parrish*, 372 F.3d at 302. Where plaintiffs accuse the government of failing to attend to their serious medical needs or protect them from a substantial risk of physical harm, government conduct that amounts to deliberate indifference is sufficiently shocking to the conscience to support a Fourteenth Amendment claim. *Id.*

"A government official violates the constitutional rights of a pretrial detainee when he knows of but disregards a serious risk of harm to the detainee." *Hearn v. Lancaster Cnty.*, 566 F. App'x 231, 235 (4th Cir. 2014). To sufficiently claim deliberate indifference, a plaintiff must allege a "serious" medical need, meaning one that "is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." *Martin v. Bowman*, 48 F.3d 1216, 1219 (4th Cir. 1995); *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) ("An injury is sufficiently serious . . . as long as it rises above the level of de minimus harm."). Next, a plaintiff must allege the government official subjectively recognized both that plaintiff was exposed to a substantial risk of harm and that his or her actions were inappropriate in light of that risk. *Hearn*, 566 F. App'x at 236; *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Although the deliberate indifference standard requires a showing of actual knowledge . . . it 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Parrish*, 372 F.3d at 303 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Here, Plaintiff sufficiently alleges a serious medical need, by putting forth facts that the State Defendants dislocated his shoulder and left the shoulder dislocated for eight hours. *See Fether v. Frederick Cnty.*, Civ. No. CCB-12-1674, 2015 WL 507817, at *7 (D. Md. Feb. 6, 2015) ("[Plaintiff] easily satisfies the first prong because '[a] substantial risk of suicide is certainly . . . 'serious harm' . . . .'"); *Ervin v. Mangum*, Civ. No. SJE-93-7129, 1997 WL 664606, at *6 (4th Cir. Oct. 27, 1997) (holding, where a plaintiff's eyes are swollen shut and nose bleeds continuously, he has serious medical needs); *cf. Conboy v. Ocean City*, Civ. No. JFM-08-2367, 2009 WL 4884514, at *2 (D. Md. Dec. 9, 2009) (holding plaintiff failed to establish a substantial

risk of serious harm where officers allowed plaintiff to drink a beer because, although alcohol can pose a general health risk, "there [we]re no facts to suggest that defendants were aware that a single beer could create a substantial risk of serious harm to [plaintiff]"). A dislocated shoulder is "so obvious" an injury "that even a lay person would recognize the necessity for a doctor's attention," and, when a doctor examined Plaintiff's shoulder, he diagnosed the injury as "mandating treatment"—treatment that included surgery. *See Martin*, 48 F.3d at 1219.

Plaintiff also sufficiently alleges that the State Defendants subjectively recognized and disregarded that risk. Based on the allegations, Brice noticed Plaintiff's pain and suggested that Braightmeyer adjust the handcuffs. (Compl. ¶ 29.) This commentary shows the State Defendants had actual knowledge of the risk of harm to Plaintiff. *See Ervin*, 1997 WL 664606, at *6 (concluding, where plaintiff alleges he conversed with officer about his "condition and his need for immediate medical care," officer is alleged to have actual knowledge of the injury). The State Defendants knowingly disregarded the risk they perceived by failing to provide Plaintiff with medical care for eight hours.

It is true that deliberate indifference is "a very high standard," one that requires a showing greater than mere negligence. *Parrish*, 372 F.3d at 303–04 ("Lest the deliberate indifference standard be transformed into negligence, we can assess the officers' response only in light of the general risks that they actually recognized."). "While . . . deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Plaintiff's allegations fall within this range between negligence and purposeful harm. In short, Plaintiff alleges that the State Defendants acted with deliberate indifference.

### d. Sexual Orientation Discrimination in Violation of the Fourteenth Amendment

Plaintiff claims that Braightmeyer violated Plaintiff's rights under the Equal Protection Clause because Braightmeyer treated Plaintiff differently than similarly-situated counterparts on the basis of his sexual orientation. (Compl. ¶ 101.) To state an equal protection claim, plaintiff must plead sufficient facts to allow the court to reasonably infer "that [plaintiff] has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *Iqbal*, 556 U.S. at 678. "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654.

Plaintiff sufficiently alleges disparate treatment. *See Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (finding sufficient allegations of disparate treatment where plaintiff alleged that seemingly heterosexual male inmates were allowed to move into double occupancy cells while his request for a double occupancy cell was denied). Plaintiff alleges that, during his arrest, Brice noticed that Plaintiff was injured and advised Braightmeyer to handcuff Plaintiff in front instead of behind his back. (Compl. ¶ 29.) Plaintiff alleges that Braightmeyer responded, "This faggot is staying hand cuffed just like this. I'm sticking to protocol." (*Id.*) Braightmeyer argues that the statement shows that he treated Plaintiff like everyone else by "sticking to protocol," (State Mot. Dismiss Mem. at 25); however, Plaintiff's point is that Braightmeyer would have deviated from the protocol for another—not homosexual—arrestee.

Plaintiff sufficiently alleges the disparate treatment was intentional. Braightmeyer knew Plaintiff was homosexual because he used the slur "faggot" and made "derogatory comments about Plaintiff's sexuality." (Compl. ¶ 29–31.) *Cf. Kerr v. Marshall Univ. Bd. of Governors*,

824 F.3d 62, 81 (4th Cir. 2016) (finding no discriminatory intent where plaintiff alleged state actor knew of plaintiff's sexual orientation but did not allege any "overt discriminatory animus"). Braightmeyer argues "use of slurs alone is not enough to establish an equal protection violation," (State Mot. Dismiss Mem. at 2) and cites *Owen-Williams v. Gaithersburg*, Civ. No. PJM-10-185, 2011 WL 53082 (D. Md. Jan. 7, 2011), in which plaintiff alleged the officer used "a single racial epithet" while arresting him with probable cause, *id.* at *4 n.1. This case is distinguishable from *Owen-Williams* because Plaintiff alleges that Braightmeyer acted *because of* his "overt discriminatory animus." *Kerr*, 824 F.3d at 81. Braightmeyer used derogatory language while refusing to accommodate Plaintiff's medical need. Consequently, Plaintiff does not allege the "slur alone."

The last question is whether Plaintiff sufficiently alleges the disparate treatment cannot be justified. "[R]ational basis review applies to classifications based on sexual orientation," meaning the state official only needs a rational basis to justify treating a plaintiff differently. *Bostic v. Schaefer*, 760 F.3d 352, 396–97 (4th Cir. 2014) (citing *Romer v. Evans*, 517 U.S. 620 (1996)). Based on Plaintiff's allegations that Braightmeyer used a slur while declining to accommodate Plaintiff's medical need, the Court can reasonably infer that Braightmeyer's action was done with discriminatory animus rather than a rational basis. Therefore, Plaintiff sufficiently pleaded an equal protection violation.

### v. Clearly Established Law (analyzed here for the purpose of the second prong of qualified immunity)

Having determined Plaintiff alleges violations of his constitutional rights, the Court turns to the second prong of qualified immunity: "whether those rights were clearly established at the time of [the] conduct." *Yates v. Terry*, 817 F.3d 877, 887 (4th Cir. 2016). The first step is to define the right narrowly, not "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731,

742 (2011). It is the defendants' burden to show they are entitled to qualified immunity. *Campbell*, 92 F. App'x at 33; *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) ("Once the district court determines that the right at issue was 'clearly established,' it becomes defendant's burden to prove that her conduct was nonetheless objectively reasonable.").

A right is clearly established when the unlawfulness of violating the right is apparent in light of pre-existing caselaw. *Yates*, 817 F.3d at 887. But, "the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity." *Edwards v. Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999); *see al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Where a constitutional violation is so obvious, it may not be necessary to look to prior precedent. *Artiga Carrero*, 270 F. Supp. 3d at 872 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see, e.g.*, *C.B. v. Sonora*, 769 F.3d 1005 (9th Cir. 2014) (holding handcuffing a disabled student was clearly excessive force). In practical terms, the issue of clearly established law is one of notice. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[E]ven in novel factual circumstances," "officials can still be on notice that their conduct violates established law." *Id.*

### a. Excessive Force in Violation of the Fourth Amendment

According to the complaint, Plaintiff presented neither as a flight risk nor as a threat to officer safety. (Compl. ¶ 24.) Braightmeyer nonetheless pushed Plaintiff to the floor with such force that he shattered a floor tile; wrenched Plaintiff's arm behind his back as he screamed; and handcuffed Plaintiff's hands behind his back despite his obvious shoulder pain. (*Id.* ¶ 25–27.) These allegations indicate that the constitutional right at issue is the right of a compliant arrestee to avoid physical injury. By contrast, State Defendants characterize the right as a right not to be

handcuffed.  They argue the Fourth Amendment allegation is based on "Braightmeyer's efforts to handcuff Plaintiff exacerbating a pre-existing injury, about which [Braightmeyer] indisputably had no knowledge," namely the fact that Plaintiff had rotator cuff surgery in 2009.  (State Mot. Dismiss Mem. at 20.)

Defendants attempt to carry their burden by showing a circuit split over whether handcuffing an arrestee behind the back can constitute excessive force.  The circuits are torn over this question, and the Fourth Circuit has not taken a side.  *Compare Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) ("[A] standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified . . . in effecting the underlying arrest.") *with E.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018) (holding officer's decision to handcuff ten-year-old student was objectively unreasonable and violated a constitutional right).  Rather, the Fourth Circuit has concluded that the reasonableness of using handcuffs should always be evaluated based on the circumstances of the case at hand.  *E.W.*, 884 F.3d at 180.  Here, handcuffing constitutes only one aspect of the force alleged.

This case falls more readily into the category of Fourth Circuit cases in which, regardless of the use of handcuffs, there was simply more force than justified.  *See, e.g.*, *Smith*, 781 F.3d at 104 (denying qualified immunity "based on the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack").  That group of cases declares that physical force is excessive when used on compliant and nonviolent arrestees.  *See Barfield*, 638 F. App'x at 203 (holding the law in 2011 clearly established that "a police officer's unprovoked tackling of a nonthreatening, nonresisting misdemeanor suspect to effect his arrest violate[d] the Fourth Amendment."); *Yates*, 817 F.3d at 887 ("[I]t was clearly established in 2008 that a police officer was not entitled to use

unnecessary, gratuitous, or disproportionate force by repeatedly tasing a nonviolent misdemeanant who presented no threat to the safety of the officer or the public and who was compliant and not actively resisting arrest or fleeing."). The cases further conclude that the illegality of such force is so clearly established by law as to put officers on notice. For example, in *Smith*, the Fourth Circuit reasoned that "the weakness of the *Graham* factors was so apparent that any reasonable officer would have realized that the force employed was excessive." 781 F.3d at 106.

The *Graham* factors are similarly weak here. Part III.A.1.iv.a, *supra*. Plaintiff alleges he knelt in the center of his living space with his hands behind his head. (Compl. ¶ 24.) He was wearing only boxer shorts. (*Id.* ¶ 24, 28.) If Plaintiff attempted to resist or flee, there were at least two officers at the scene. (*Id.* ¶ 29.) Despite Plaintiff's compliance, Braightmeyer twisted Plaintiff's arm behind him and pushed his face to the floor, cracking a floor tile. (*Id.* ¶ 25–26.) Plaintiff's pain was visible as evidenced by Brice's suggestion that Braightmeyer adjust the handcuffs. (*Id.* ¶ 29.) Like in *Smith* and *Barfield*, in which the plaintiffs did nothing to warrant the officer's use of force, Plaintiff posed neither a threat nor flight risk. As such, the State Defendants' conduct violated Plaintiff's clearly established right to remain free of physical injury when compliant with arresting officers and, consequently, was not objectively reasonable.

### b. Deliberate Indifference to Serious Medical Need in Violation of the Fourteenth Amendment

Defendants also fail to carry their burden in the context of deliberate indifference to a serious medical need. According to the complaint, Plaintiff spent eight hours in Braightmeyer's custody with a visibly dislocated shoulder. (Compl. ¶ 33–34.) The Fourth Circuit has held that pretrial detainees have a clearly established right to immediate medical care when they are visibly injured and in pain. *Ervin*, 1997 WL 664606, at *6 (holding it was "a violation of clearly

established law to deny a pretrial detainee immediate medical care whose eyes were swollen shut, whose face was broken, and whose nose had bled all night and continued bleeding."); *see also Iko*, 535 F.3d at 243 (holding it was objectively unreasonable for officers to fail to attend to a nonresponsive detainee whom the officers had repeatedly pepper-sprayed before leaving him face down on the floor). Both Braightmeyer and Brice were on notice that failing to attend to Plaintiff's visible and painful injury would violate the law.

### c. *Sexual Orientation Discrimination in Violation of the Fourteenth Amendment*

Braightmeyer fails to carry his burden in the context of sexual orientation discrimination too. In response to Plaintiff's alleged equal protection right, Braightmeyer cites no authority and argues that "[t]he use of inappropriate language in the context of an otherwise lawful arrest is . . . not in itself a clear violation of the law." (State Mot. Dismiss Mem. at 29.) But, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Md. State Conference of NAACP Branches v. Md. State Police*, 454 F. Supp. 2d 339, 347 (D. Md. 2006). The right to equal protection of the laws is so fundamental as to put any officer on notice. *See Artiga Carrero*, 270 F. Supp. 3d at 872 (holding that, because "the right not to be seized solely on account of one's race is so fundamental," the fact that the Supreme Court stated the rule generally does not stop the right from being clearly established nor fail to put officers on notice). And, the illegality of discriminating on the basis of sexual orientation is clearly established at this point. *Romer v. Evans*, 517 U.S. 620, 635 (1996); *Bostic*, 760 F.3d at 384. Therefore, any officer would know that treating individuals differently based on sexual orientation was unlawful. When Braightmeyer refused to stray from protocol and implied, by his

slur, that he otherwise might have strayed but for Plaintiff's sexual orientation, Braightmeyer had notice of the illegality of that conduct.

To sum up, Plaintiff has alleged violations of his constitutional rights, and the State Defendants have failed to show that their actions were nonetheless objectively reasonable. Therefore, the § 1983 claims against both State Defendants (Count 1 and 2) and the claim against Braightmeyer (Count 4) survive the motion to dismiss.

### 2. Maryland State Law Claims[4]

Turning to the Maryland state law claims, the Court concludes the State Defendants fail to establish statutory immunity. The Court also concludes Plaintiff has sufficiently pleaded each claim (Counts 6, 7, 9, 10, 11, and 12).

### i. Statutory Immunity

State Defendants argue, as state personnel, they are entitled to Maryland statutory immunity. (State Mot. Dismiss Mem. at 37.) "State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the state or its units have waived immunity . . ." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). This provision renders state officials immune from liability in federal court. *See Thomas v. Maryland*, Civ. No. GJH-17-1739, 2017 WL 6547733, at *9 (D. Md. Dec. 20, 2017) (dismissing claims against state officials where complaint contained no allegations of malice or gross negligence); *Hines v. French*, 852 A.2d 1047, 1061 (Md. 2004) (concluding immunity extends to negligence, intentional torts, and

---

[4] Plaintiff also alleges a *Longtin* claim against State Defendants, as well as all other defendants. The Court will analyze the *Longtin* claim with the *Monell* claim alleged only as to the County, Part III.B.1, *infra*.

constitutional torts). Where, as here, Plaintiff sues Defendants for damages, a finding that they had statutory immunity would dismiss the state law claims.

Plaintiff counters that State Defendants acted with gross negligence, even malice, by demonstrating an indifference to Plaintiff's prolonged pain and an animus toward who he was. (Pl. Opp. State Mot. Dismiss at 30–31.) To allege either malice or gross negligence, a plaintiff "must point to specific facts that raise an inference" because conclusory allegations are not enough. *Nero v. Mosby*, Civ. No. CCB-16-1304, 2018 WL 4033768, at \*5 (D. Md. Aug. 23, 2018) (dismissing the state law claims against a defendant who was acting within the scope of her employment and without malice or gross negligence). To allege malice "requires a showing that the official intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately injure the plaintiff." *Talley v. Farrell*, 156 F. Supp. 2d 534, 545 (D. Md. 2001). Malice is "heinous conduct, characterized by fraud, ill will, spite, evil motive, conscious wrongdoing, or intent to injure." *DiPino v. Davis*, 729 A.2d 354, 374 (Md. 1999). "Merely asserting that an act was done maliciously" does not "overcome a motion raising governmental immunity"; rather, "the plaintiff must allege with some clarity and precision those facts which make the act malicious." *Elliott v. Kuperman*, 473 A.2d 960, 969 (Md. Ct. Spec. App. 1984).

The Maryland Court of Appeals treats § 5-522(b) gross negligence as "something more than simple negligence, and likely more akin to reckless conduct." *Newell v. Runnels*, 967 A.2d 729, 764 (Md. 2009). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Cooper v. Rodriguez*, 118 A.3d 829, 832–33 (Md. 2015). In other words, gross

negligence occurs when a state employee "is so 'utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Bost v. Wexford Health Sources, Inc.*, Civ. No. ELH-15-3278, 2018 WL 3539819, at *44 (D. Md. July 23, 2018) (quoting *Newell*, 967 A.2d at 764–65).

Plaintiff offers enough facts to allege malice and gross negligence. Braightmeyer intentionally used force on a compliant arrestee and demonstrated ill will by using a slur. What's more, he allegedly showed a prolonged indifference to Plaintiff's pain. Plaintiff sufficiently asserts Brice's gross negligence by alleging that Brice observed Plaintiff's pain and Braightmeyer's derogatory language and knowingly failed to intervene. Because Plaintiff points to specific facts to support an inference of malice and gross negligence, the Court rejects State Defendants' assertion of statutory immunity pursuant to § 5-522(b). *See, e.g.*, *Estate of Robert Ethan Saylor v. Regal Cinemas, Inc.*, Civ. No. WMN-13-3089, 2016 WL 4721254, at *14 (D. Md. Sept. 9, 2016) ("As the Court has concluded that the evidence could support a finding that [defendants] acted with gross negligence, they are not entitled to judgment on the issue of [statutory] immunity at this stage of the litigation."). The Court turns next to whether Plaintiff has sufficiently alleged each state law claim.

### ii. *Maryland Constitutional Claims*

Plaintiff alleges State Defendants used excessive force in violation of Articles 24 and 26 of the Maryland Constitution (Count 6) and subjected him to cruel and unusual punishment in violation of Articles 16 and 25 of the Maryland Constitution (Count 7). The Maryland constitutional claims that Plaintiff raises parallel his federal constitutional claims. "Articles 24 and 26 of Maryland Declaration of Rights are the state constitutional counterparts to the Fourteenth and Fourth Amendments, respectively." *Meyers v. Balt. Cnty.*, 981 F. Supp. 2d 422, 430 (D. Md. 2013). These state provisions are interpreted in light of their federal analogs,

meaning a given constitutional claim is analyzed the same whether it is brought under an Article

of the Maryland Constitution or an Amendment to the U.S. Constitution.  *Henry v. Purnell*, 501

F.3d 374, 382 n.10 (4th Cir. 2007) (holding that an excessive force claim is analyzed the same

whether it is brought under the Fourth Amendment or Article 26 of the Maryland Constitution);

*Bost*, 2018 WL 3539819, at *42 ("[T]he analysis under Article 24 is, for all intents and purposes,

duplicative of the analysis under the Fourteenth Amendment."); *id.* at 42 (same as to Article 25

and the Eighth Amendment).  The difference is that state officials may not invoke the protection

of qualified immunity for the state constitutional claims.  *Meyers*, 981 F. Supp. 2d at 430.

Because Plaintiff sufficiently alleged violations of the U.S. Constitution, Part III.A.1.iv, *supra*,

Plaintiff has alleged corresponding violations of the Maryland Constitution.

### iii.    *Negligence and Gross Negligence*

Plaintiff alleges negligence and gross negligence against the State Defendants.  To state a

negligence claim, a plaintiff must allege facts demonstrating "(1) that the defendant was under a

duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the

plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from

the defendant's breach of the duty."  *Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.*, 854 A.2d

1232, 1238 (Md. 2004).  Maryland law has adopted the same definition of gross negligence at

common law as it has under statutory immunity.  Part III.A.2.i, *supra*.  Consequently, gross

negligence is "an intentional failure to perform a manifest duty in reckless disregard of the

consequences as affecting the life or property of another, and also implies a thoughtless disregard

of the consequences without the exertion of any effort to avoid them."  *Cooper*, 118 A.3d at 832–

33; *see Liscombe v. Potomac Edison Co.*, 495 A.2d 838, 846 (Md. 1985).

In the parties' filings, they only argue over gross negligence—presumably because, if State Defendants fail to establish gross negligence, statutory immunity would shield them from simple negligence. (State Mot. Dismiss Mem. at 34; Pl. Opp. State Mot. Dismiss at 27.) Because gross negligence has been alleged, the Defendants are shielded from neither simple nor gross negligence. *See Lee v. Queen Anne's Cnty. Office of Sheriff*, Civ. No. RDB-13-672, 2014 WL 476233, at *17 (D. Md. Feb. 5 2014) (declining to dismiss negligence where plaintiff alleged malice but noting that "immunity would shield [defendant] from liability for simple negligence if he is subsequently unable to prove malice or gross negligence"); *Humbert v. O'Malley*, Civ. No. WDQ-11-0440, 2011 WL 6019689, at *10 (D. Md. Nov. 29, 2011) (declining to dismiss negligence claim even though "a state employee cannot be held liable for ordinary negligence" because "gross negligence [is] sufficient to overcome [defendant's] claim of immunity").

Police officers do not owe a special duty to arrestees; therefore, the State Defendants had a duty to act with reasonable care in arresting Plaintiff. Plaintiff alleged facts that plausibly show a breach of that duty—even "an intentional failure to perform a manifest duty." *Cooper*, 118 A.3d at 832–33. Braightmeyer allegedly acted with excessive force during the arrest and with deliberate indifference toward Plaintiff's injury after the arrest. These actions breached Braightmeyer's duty to act with reasonable care and crossed the line into "reckless disregard of the consequences" of his actions. *Id.* Brice, in turn, observed Braightmeyer's conduct and knowingly failed to intervene. Braightmeyer's actions and Brice's inaction caused Plaintiff's dislocated shoulder and his accompanying injuries. These allegations suffice to state claims for negligence and gross negligence.

### iv.    *Intentional Infliction of Emotional Distress*

To plead intentional infliction of emotional distress ("IIED") under Maryland law, a plaintiff must allege sufficient facts in support of four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." *Takacs v. Fiore*, 473 F. Supp. 2d 647, 651–52 (D. Md. 2007) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)); *see also Ky. Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8, 9 (Md. 1997) (noting standard to plead IIED is a "stringent" one). Here, Plaintiff alleges intentional conduct on the part of the State Defendants and causation by claiming that he experienced no emotional distress before the arrest. The remaining questions are whether Plaintiff alleged conduct that was sufficiently extreme and outrageous and emotional distress that was sufficiently severe.

Plaintiff alleges that State Defendants' conduct of forcefully arresting him and leaving him in pain during the day was extreme and outrageous. Maryland courts have interpreted extreme and outrageous conduct as "utterly intolerable" behavior that goes "beyond all possible bounds of decency." *Hines v. French*, 852 A.2d 1047, 1060 (Md. 2004). Here, the Court scrutinizes the allegations of misconduct because law enforcement officers are "in a peculiar position to harass the plaintiff and cause emotional distress." *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F. Supp. 720, 747–48 (D. Md. 1996); *id.* at 748 ("Abuse of a position of authority, real or apparent, may . . . lend itself to a determination that the conduct in question is sufficiently outrageous."). *Hines* is particularly instructive. In *Hines*, an officer pulled over a suspect in a hit-and-run incident, noticed scarring from a recent surgery, laughed at the pain he inflicted upon the suspect as a result of that fresh scarring, and refused to adjust the handcuffs that she said were painful. 852 A.2d at 1060. The Maryland Court of Appeals found the

behavior inappropriate but not extreme and outrageous. *Id.* Here, the alleged conduct is more egregious because Braightmeyer significantly worsened Plaintiff's injury, handcuffed him in a manner that caused him pain, and left him in a state requiring medical attention for eight hours. (Compl. ¶ 33–34.) The Court concludes that the alleged misconduct is "utterly intolerable," *Hines*, 852 A.2d at 1060.

Plaintiff alleges that he suffered severe emotional distress. Severe distress is that which "no reasonable man could be expected to endure." *Harris*, 380 A.2d at 616. This threshold is reached when the distress disrupts the "ability to function on a daily basis." *Bryant*, 923 F. Supp. at 750; *see, e.g.*, *Takacs*, 473 F. Supp. 2d at 652 (holding failure to allege severe emotional distress where plaintiff claimed to suffer "severe depression, anxiety, sleeplessness, headaches" but not an inability to function—e.g., inability to return to work); *Harris*, 380 A.2d at 616 (same where "plaintiff showed no more than humiliation, an aggravation of an existing nervous condition, and the worsening of a speech impediment that required no change in the treatment"). "While the emotional distress must be severe, it need not produce total emotional or physical disablement." *B.N. v. K.K.*, 538 A.2d 1175, 1181 (Md. 1988); *see, e.g.*, *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991) (holding severe emotional distress was sufficiently pleaded where plaintiff alleged injuries—e.g., anxiety, depression, obsession, systemic hypertension, "impairment of his ability to form intimate relationships"—all of which required psychological therapy and counseling). Here, Plaintiff alleges that he became suicidal and underwent three psychiatric hospitalizations, (Compl. ¶ 55) evincing an inability to function daily. Despite the strictness of the standard, Plaintiff has sufficiently pleaded an IIED claim.

### v. *Battery*

Plaintiff alleges Braightmeyer "attacked and beat [him] with no justification, subjecting him to severe bodily injury." (Compl. ¶ 167.) Battery "is the unlawful application of force to the person of another." *Snowden v. State*, 583 A.2d 1056, 1059 (Md. 1991). Police officers have a privilege to commit a battery during a lawful arrest, but the privilege only extends to reasonable force, not excessive force. *French*, 957 A.2d at 1037. Because Plaintiff has succeeded in alleging sufficient facts to state an excessive force claim, he also sufficiently alleges battery.

### B. County Defendants' Motion to Dismiss

Plaintiff essentially makes the same claims against the County, Sheriff Hofmann, Warden Cooke, and Officers Duckery and Crabtree. In addition to Fourth and Fourteenth Amendment violations, Plaintiff adds that Warden Cooke and the two corrections officers violated the Eighth Amendment (Counts 1, 2, and 3). Plaintiff also attempts to claim liability against the County (Count 5 and 8). Plaintiff alleges all the same state law claims as he did against the State Defendants except for the battery claim (Counts 6, 7, 9, 10, and 11). The County Defendants move to dismiss, arguing that Plaintiff has failed to state claims as to each defendant. For the state claims, they also assert insufficient notice and statutory immunity. The Court grants the motion to dismiss for the most part but declines to dismiss Counts 1 and 3 as to Warden Cooke.

### 1. Monell *(and* Longtin*) Claims (Counts 5 and 8)*

Before analyzing the remaining federal and state claims, the Court addresses together the federal *Monell* claim and its Maryland counterpart, the *Longtin* claim. Plaintiff fails to sufficiently allege the existence of any county policy or custom under any of the enumerated standards, and such a failure defeats both claims. The Court will dismiss Counts 5 and 8.

Section 1983 applies to municipalities and other local government units, including counties, and allows county liability not under a *respondeat superior* theory but, rather, where official county policy of some sort caused a constitutional tort. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). *Monell* liability thus arises where the county employee's constitutionally offensive conduct is performed in furtherance of some "policy or custom." *Milligan v. Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). A policy or custom can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

Plaintiff alleges the County had a "pattern and practice of continually delegating non-delegable duties" and appears to argue the policy arises under both failure to train and persistent and widespread custom. (Compl. ¶ 108; Pl. Opp. County Mot. Dismiss at 11, ECF No. 17.) Plaintiff points to two sets of allegations as constituting a pattern and practice: first, the County Drug Task Force officers condoning Braightmeyer's actions during the arrest, and, second, Warden Cooke and corrections officers repeatedly denying Plaintiff medical care. (Pl. Opp. County Mot. Dismiss at 11.) Plaintiff asserts that these facts indicate the County failed to train its employees and created persistent and widespread customs of constitutional misconduct.

Regarding the failure to train argument, Plaintiff argues "[n]othing more need be, nor can be, alleged" because where lack of training or supervision is asserted, "no more specificity is possible." (*Id.*) In fact, to properly allege failure to train, a plaintiff must plead "facts such that

the Court may draw a reasonable inference that (1) the County has actual or constructive notice of a deficiency in its training program that causes its employees to violate citizens' constitutional rights and (2) that despite this knowledge, it has chosen to retain that system." *McDonnell v. Hewitt-Angleberger*, Civ. No. WMN-11-3284, 2012 WL 1378636, at *4 (D. Md. April 19, 2012) ("[P]ointing to a total of three incidents of alleged police brutality over a period of two and a half years is insufficient to demonstrate a pattern that could reasonably put the County on constructive notice of a deficiency in the training program."); *cf. Artiga Carrero*, 270 F. Supp. 3d at 865–66 (sufficiently pleading failure to train by alleging that officers violated a required policy and that the field manual omitted the required policy). Plaintiff fails to allege a specific deficiency in the County's training program, let alone, the County's knowledge and disregard of that deficiency.

Plaintiff also fails to state a *Monell* claim under a custom by condonation theory, which requires a plaintiff to allege a "persistent and widespread" practice so longstanding and pervasive as to indicate that "policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Owens*, 767 F.3d at 401. Plaintiff states that the County's constitutional violation is not a single isolated, accidental, or peculiar event but, rather, a regular occurrence (Compl. ¶ 108); however, Plaintiff alleges no other incidents like those he experienced. *Cf. Owens*, 767 F.3d at 403 (supporting allegation of persistent and widespread practice by pointing to prior cases and prior successful motions on similar facts). It is not enough to allege the instance at hand and infer that it is part of a broader practice. *Walker v. Prince George's Cnty.*, 575 F.3d 426, 431 (4th Cir. 2009); *see also Milligan*, 743 F.2d at 230 ("[A] municipal policy or custom giving rise to § 1983 liability will not be

inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees.").

Alternatively, Plaintiff cites *Canton v. Harris*, 489 U.S. 378 (1989) and *Pembaur v. Cincinnati*, 475 U.S. 469 (1986) for the proposition that allegations of a single incident can establish a *Monell* claim under both theories. The Supreme Court in *Canton* hypothesized single-incident liability in the context of the failure to train theory but has since declined to utilize it, maintaining its conclusion that "a pattern of violations is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 68–69 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997)). *Pembaur* is distinguishable in that *Pembaur* concerned a *Monell* claim under a theory that the complained of conduct was performed by an officer with final policy-making authority. 475 U.S. at 482–84; *see id.* at 482 n.10 ("Because there is no allegation that the action challenged here was pursuant to a local 'custom,' this aspect of *Monell* is not at issue in this case.").

Plaintiff alleges that all Defendants are liable under *Prince George's Cnty. v. Longtin*, 19 A.3d 859 (Md. 2011). (Compl ¶ 134.) "*Longtin* claims are essentially Maryland's version of *Monell* claims."[5] *Rosa v. Bd. of Ed. of Charles Cnty.*, Civ. No. AW-11-2873, 2012 WL 3715331, at *9 (D. Md. Aug. 27, 2012). As with the *Monell* claim, Plaintiff falls short of sufficiently alleging facts to permit a reasonable inference that the County failed to train its employees or had a pervasive and widespread custom of unconstitutional arrests and deliberate indifference to medical care. *See Weeden v. Prince George's Cnty.*, Civ. No. GJH-17-2013,

---

[5] Plaintiff argues that "the pleading standard for a *Longtin* claim is **lower** than that for a *Monell* claim." (Pl. Opp. County Mot. Dismiss at 17.) It is true that, in contrast to § 1983 liability, Maryland law permits counties and county officers to be held liable for their employees' actions under *respondeat superior*. *DiPino*, 729 A.2d at 372. But, this separate cause of action does not render the *Longtin* claim any broader than a *Monell* claim.

2018 WL 2694441, at *4 n.10 (D. Md. June 4, 2018) (holding failure to allege policy or custom results in the dismissal of both *Monell* and *Longtin* claims); *Knox v. Mayor & City Council Balt. City*, Civ. No. JKB-17-1384, 2017 WL 5903709, at *9 (D. Md. Nov. 30, 2017) (same); *Devi v. Prince George's Cnty.*, Civ. No. DKC-16-3790, 2017 WL 3592452, at *4 (D. Md. Aug. 21, 2017) (same); *McMahon v. Cnty. Comm'rs of Kent Cnty.*, Civ. No. JFM-13-490, 2013 WL 2285378, at *4 n.6 (D. Md. May 21, 2013) (same).

Having concluded that Plaintiff fails to state a *Monell* or *Longtin* claim that is plausible on its face, the Court need not address Defendants' argument that it should bifurcate those claims pursuant to Federal Rule of Civil Procedure 42(b). *Brissett v. Paul*, 1998 WL 195945, at *5 (4th Cir. Apr. 6, 1998); *see Gray v. Maryland*, 228 F. Supp. 2d 628, 638 (D. Md. 2002) (bifurcating policy or custom claims from other claims "to maximize efficiency and convenience" and "minimize unfair prejudice and delay"). Further, because Plaintiff fails to state a *Monell* or *Longtin* claim, Count 5 will be dismissed as to the County, and Count 8 will be dismissed as to all Defendants. Because there is no *respondeat superior* liability for § 1983 claims, the County cannot be liable (without *Monell*) for any of the § 1983 claims (Counts 1 and 2). By contrast, if any of the County Defendants are liable for the state law claims, the County would also be liable under a *respondeat superior* theory (Counts 6, 7, 9, 10, and 11).

### *2. Defendant Sheriff Hofmann*

Plaintiff sues Sheriff Hofmann in his official[6] and individual capacities. (Compl. ¶ 13, 64, 147.) Plaintiff alleges very few factual allegations in relation to Sheriff Hofmann, instead

---

[6] County Defendants argue that a sheriff is a state rather than a county official. (County Mot. Dismiss Mem. at 13–16, ECF No. 3-1.) This is not a straightforward issue. The Supreme Court held that whether a sheriff is a state actor for § 1983 purposes is determined on a case by case and state by state basis. *McMillian v. Monroe Cnty.*, 520 U.S. 781, 793 (1997). In Maryland, a sheriff's liability under § 1983 depends on whether the sheriff's alleged actions implicate the policies of the county or the policies of the state. *Fether*, 2013 WL 1314190, at *7 (noting the Fourth Circuit has concluded that county liability for a sheriff depends on whether the sheriff has "final policymaking authority for the [c]ounty"). Because the Court concludes that Plaintiff fails to allege a *Monell* claim,

making conclusory statements as to the Sheriff's liability. For example, Plaintiff alleges that Sheriff Hofmann "knowingly allowed the attacks by another Officer against Plaintiff," (*id.* ¶ 64); that "the acts or omissions of all Defendants were the direct causes of [Plaintiff's] resulting injuries," (*id.* ¶ 86); and that "Defendants were acting pursuant to custom, policy, decision, ordinance, widespread habit, practice, and usage in their actions against [Plaintiff]" (*id.* ¶ 88). Plaintiff argues that Sheriff Hofmann is liable as an individual and as a supervisor of State Defendants Brice and Braightmeyer. (*Id.* ¶ 13, 64, 147; *see also* Pl. Opp. County Mot. Dismiss at 18–20.)

But, there are simply no facts indicating that Sheriff Hofmann took action or was present at any of the events. Where a complaint fails to allege facts as to an essential element or a defendant, the complaint must be dismissed. *See Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621 (4th Cir. 2018) ("[W]here a plaintiff has made no allegations that show a sufficiently imminent threat of injury from future identity theft, the plaintiff's 'contention of an enhanced risk of future identity theft' is simply 'too speculative.'"); *Cooper v. Corizon, Inc.*, Civ. No. JFM-11-1617, 2012 WL 2135595, at *4 (D. Md. June 12, 2012) (dismissing the counts against a particular defendant because the complaint made no mention of him except to list him as a defendant).

The complaint is also devoid of allegations implicating Sheriff Hofmann in a supervisory role. To claim supervisory liability, a plaintiff must allege that the supervisor (1) "had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) inadequately

---

which would implicate an official capacity claim, and simply fails to state facts implicating Sheriff Hofmann's individual liability, the Court need not address the question of whether Sheriff Hofmann is a state actor and, thus, entitled to sovereign immunity.

responded to that knowledge, thus, showing "deliberate indifference to or tacit authorization of the alleged offensive practices"; and, (3) by his inadequate response, caused the constitutional injury. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Here, Plaintiff merely alleges that Sheriff Hofmann oversees the Drug Task Force. *See Sorrick v. Manning*, Civ. No. TDC-16-0709, 2017 WL 3668755, at *13 (D. Md. Aug. 22, 2017) (dismissing supervisory liability claim because "[a]part from his general allegation that Secretary Moyer is legally responsible for inmate well-being, Sorrick makes no other specific allegations about his conduct").

Because of the dearth of factual allegations relating to Sheriff Hofmann, the Court will dismiss all counts, both federal and state, as to the Sheriff.

### *3. Defendant Corrections Officers Duckery and Crabtree*

The complaint is similarly devoid of specific factual allegations as to Duckery and Crabtree. Crabtree is merely listed as a defendant. *See Cooper*, 2012 WL 2135595, at *4 (dismissing the counts against a defendant who was merely listed in the complaint). In addition to being listed, Duckery is alleged to have taken Plaintiff to the University of Maryland emergency care facility and, subsequently, the Baltimore Shock Trauma Center. (Compl. ¶ 39– 40.) Duckery also *may* have told Warden Cooke that Plaintiff needed surgery within two days. (Compl. ¶ 41 ("Plaintiff heard Officer Duckery and/or Officer John Doe #1 tell Warden Cooke that surgery had to be done within two days.").) The Complaint includes allegations related to the group of "unidentified Corrections Officers," (*see, e.g.*, Compl. ¶ 44) but these vague allegations do not accumulate to the point of sufficiently stating claims against specific corrections officers, like Duckery and Crabtree. Therefore, Plaintiff fails to state a claim as to particular corrections officers. The Court will dismiss all counts, both federal and state, as to Duckery and Crabtree.

### *4. Defendants Warden Cooke and the County*

Of the County Defendants, Warden Cooke and the County remain. The Court analyzes the remaining federal counts (Counts 1, 2, and 3) as to Warden Cooke and the remaining state counts (Counts 6, 7, 9, 10, and 11) as to Warden Cooke and the County.

The complaint sues Warden Cooke in his individual and official capacities. Unlike state officials, a unit of a county government is a "person" within the meaning of § 1983 and can be liable for the torts of its officials acting in their official capacities. *Ashton v. Brown*, 660 A.2d 447, 468 (Md. 1995). Local government liability is based on whether the official's actions are "in fact the acts of the local government itself." *Id.* This occurs "only to the extent that his

actions implement governmental law, policy or custom." *Id.* In other words, county liability in its official capacity only exists to the extent that the action was taken in furtherance of a custom. Because Plaintiff failed to allege a custom, Part III.B.1, *supra*, Warden Cooke cannot be liable in his official capacity for the § 1983 claims. To the extent Plaintiff alleges Maryland state law claims against Warden Cooke in his official capacity, those official capacity claims must also be dismissed. *See Ritchie v. Donnelly*, 597 A.2d 432, 446 (Md. 1991) (holding "that the particular and confusing dichotomy developed in § 1983 cases has no application to actions against individual government officials for money damages based on violations of Maryland constitutional rights"). The Court will dismiss any counts against Warden Cooke in his official capacity.

This Court turns first to the federal § 1983 claims against Warden Cooke and, subsequently, to the Maryland state law claims against him.

### i. Section 1983 Claims

Warden Cooke is not entitled to qualified immunity. *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 470 (4th Cir. 2013) ("[Q]ualified immunity from suit under [§] 1983 does not extend to municipal defendants . . . ."); *see Owen v. Independence*, 445 U.S. 622, 650 (1980) ("Our rejection of a construction of § 1983 that would accord municipalities a qualified immunity for their good-faith constitutional violations is compelled both by the legislative purpose in enacting the statute and by considerations of public policy."). The Court addresses each § 1983 claim to determine whether Plaintiff states a claim against Warden Cooke.

### a. Excessive Force in Violation of the Fourth Amendment

Plaintiff claims a Fourth Amendment violation against "all Defendants." (Compl. ¶ 76–89.) The complaint states that all "Defendant Officers orchestrated and executed the attack on

[Plaintiff], and are directly liable for the resulting conduct." (*Id.* ¶ 84.) It is difficult to discern from the complaint how the warden of the county jail could be liable for excessive force during an arrest, in which he did not participate. In opposition to the motion to dismiss, Plaintiff offers no hint as to how Warden Cooke would be liable under those circumstances. (*See* Pl. Opp. County Mot. Dismiss at 8, 15, 21–25.) In the absence of specific factual allegations, the Court will dismiss Count 2 as to Warden Cooke and the County.

### b. Deliberate Indifference to Serious Medical Need in Violation of the Fourteenth and Eighth Amendments

The standard for deliberate indifference under the Eighth Amendment parallels that of the Fourteenth Amendment. *See* Part III.A.1.iv.c, *supra*. The distinction between the two violations is a temporal one, which depends on whether the Plaintiff was a pretrial detainee or a postconviction prisoner at the time of the alleged indifference. Thus, the Eighth Amendment standard involves the same two prongs: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97–98. "If the [medical] provider has taken any action at all, a court may not be willing to find deliberate indifference." Joel H. Thompson, *Today's Deliberate Indifference: Providing Attention without Providing Treatment to Prisoners with Serious Med. Needs*, 45 Harv. Civ. Rights-Civ. Liberties L. Rev. 635, 650 (2010).

In support of the Fourteenth Amendment violation, Plaintiff alleges that, when he was a pretrial detainee, Warden Cooke was deliberately indifferent to his injury and need for surgery. First, Plaintiff establishes the risk of serious harm prong because he alleges that multiple doctors prescribed immediate and necessary surgery (Compl. ¶ 41, 45)—not "elective" surgery. *See Martin*, 48 F.3d at 1220 (finding no evidence to support constitutional violation where prisoner was given access to doctors, prescribed pain medication, but denied "elective" surgeries). Next,

Plaintiff alleges that Warden Cooke took notice of Plaintiff's shoulder injury, asking the officers why Plaintiff had not received treatment. (Compl. ¶ 37.) Later, Warden Cooke was informed that a doctor had recommended immediate surgery on Plaintiff's shoulder. (*Id.* ¶ 41.) Moreover, Plaintiff asked about surgery multiple times a day for the next two weeks. (*Id.* ¶ 43–44.) Warden Cooke took no action to address this medical need and, thus, disregarded it.

Plaintiff claims that Warden Cooke violated the Eighth Amendment as well. Plaintiff claims another risk of serious harm because he alleges that, while he was incarcerated, his surgeon wrote a doctor's note stating that Plaintiff needed "physical therapy three to five times a week" and an evaluation by a neurosurgeon. (Compl. ¶ 48.) Plaintiff alleges that Warden Cooke knew of Plaintiff's substantial risk of serious harm for two reasons. First, on January 3, 2016, the surgeon provided the detention center with the doctor's note detailing Plaintiff's medical needs. (*Id.*) Second, between January 3 and Plaintiff's release at the end of January, Plaintiff filed grievances requesting medical treatment "virtually every day." (*Id.*) It is plausible that Warden Cooke received the doctor's note and the grievances. Therefore, Plaintiff sufficiently alleges that Warden Cooke was deliberately indifferent to his medical needs.

Consequently, the Fourteenth Amendment claim (Count 1) and the Eighth Amendment claim (Count 3) as to Warden Cooke survive the motion to dismiss.

### ii.    *Maryland State Law Claims*

County Defendants argue Plaintiff failed to sufficiently plead the state constitutional violations and tort claims. They argue Plaintiff failed to satisfy notice. Md. Code Ann., Cts. & Jud. Proc. § 5-304(b). And, they argue they are entitled to statutory immunity. Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1). Because this Court concludes that Warden Cooke, the remaining defendant, is entitled to immunity, the Court does not address the alternative

arguments and dismisses the state law claims against Warden Cooke and the County (Counts 6, 7, 9, 10, and 11).

### a. Statutory Immunity

"An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action." Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1). Here, Warden Cooke is entitled to statutory immunity because he was acting within the scope of his official duties when he observed and discussed Plaintiff's injuries and because he acted without malice.

At all times alleged in the complaint, Warden Cooke was directing corrections officers within the scope of his governmental role as the warden of a county jail. *Thomas v. Maryland*, 2017 WL 6547733, at *7 (noting that county defendants "enjoy immunity from tort liability arising out of functions characterized as 'governmental'"). And, Plaintiff makes no allegations that Warden Cooke acted with malice. In the context of § 5-507(a)(1), "Maryland courts define malice as conduct 'motivated by ill will, by an improper motive, or by an affirmative intent to injure.'" *King-Fields v. Leggett*, Civ. No. ELH-11-1491, 2012 WL 203400, at *7 (D. Md. Jan. 23, 2012) (quoting *Shoemaker v. Smith*, 725 A.2d 549 (Md. 1999)); *see Ihnken v. Garner*, 927 F. Supp. 2d 227, 243 (D. Md. 2013) (finding an email comment that the plaintiffs were "Birkenstock wearin' tree-huggers" did not establish malice); *cf. Moxley v. Walkersville*, 601 F. Supp. 2d 648, 665 (D. Md. 2009) (denying motion to dismiss because plaintiff sufficiently alleged that defendants were motivated by an anti-Muslim bias). Merely disregarding a medical need does not amount to the requisite ill will. *See Thomas*, 2017 WL 6547733, at *7 (concluding allegations at most showed indifference where the warden knew that inmate needed to be removed from general population but delayed his transfer).

Where a complaint makes no allegations that an official acted with malice, the court may conclude that the official is entitled to statutory immunity and dismiss the complaint. *See Cortez v. Prince George's Cnty.*, Civ. No. AW-00-3101, 2000 WL 1832318, at *4 (D. Md. Nov. 28, 2000) (dismissing claims pursuant to statutory immunity because the complaint merely alleged negligence, not malice), *aff'd in part and rev'd in part*, 31 F. App'x 123 (4th Cir. 2002).

### C. Defendant Corrections Officer Hamifee's Motion to Dismiss

Hamifee argues that the claims against her must be dismissed because of "the complete absence of any factual allegations as to her." (Hamifee Mot. Dismiss Mem. at 2, ECF No. 25-1.) In the alternative, Hamifee notes that "any official capacity claims that might survive should be bifurcated." (*Id.*) The complaint describes "Officer Marcy of the Queen Anne's County Detention Center" as "responsible for a pattern and practice of misconduct." (Compl. ¶ 17, 21.) She is grouped with the "Defendant Corrections Officers," but no additional facts are provided as to her actions, omissions, or, even, presence. Plaintiff points to several paragraphs in the complaint (Pl. Opp. Hamifee Mot. Dismiss at 2, ECF No. 26), but the paragraphs refer to unidentified officers and make conclusory statements—e.g., "Defendant Correction[s] Officers refused to timely render appropriate medical assistance"; "Defendant Correction[s] Officers participated in and enabled the pattern or practice and conduct which interfered with [Plaintiff's] medical treatment." (*See id.* ¶ 4, 5, 37, 38, 59, 60, 67, 93.) Such conclusory allegations made against a group of individuals is not specific enough to state a § 1983 claim that satisfies Rule 8(a). *See Proctor v. Wells Fargo Bank, N.A.*, 289 F. Supp. 3d 676, 690 (D. Md. 2018) ("Section 1983 requires a showing of personal fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs.").

## IV.    Conclusion

For the foregoing reasons, an Order shall enter, (1) denying State Defendants' Motion to Dismiss as to Counts 1, 2, 4, 6, 7, 9, 10, 11, 12 and granting it as to Count 8; (2) denying County Defendants' Motion to Dismiss as to Counts 1 and 3 against Defendant Warden Cooke and granting the motion as to all other counts and defendants; and (3) granting Defendant Officer Hamifee's Motion to Dismiss.[7]

DATED this 12th day of December, 2018.

BY THE COURT:

_____
/s/

James K. Bredar
Chief Judge

---

[7]    Although the Court recognizes that claims often fail at the motion to dismiss stage, there are several claims here that border on, or are in fact, frivolous. Plaintiff alleges *Monell* and *Longtin* claims by making only conclusory statements as to the hallmark element of those claims: a county policy or custom. Plaintiff alleges nine claims against three corrections officers but barely any facts as to whether those officers ever interacted with Plaintiff. Plaintiff alleges eight claims against Sheriff Hofmann without alleging a single fact as to his individual liability and one conclusory statement as to his supervisory liability. And, Plaintiff alleges that Brice and Braightmeyer are liable in their official capacities despite the enormity of the contravening case law. *See, e.g.*, *Gollomp v. Spitzer*, 568 F.3d 355, 373 (2d Cir. 2009) (holding that the claims "were not well researched and were frivolous" because established case law cleanly rejects "plaintiff's bare assertion that sovereign immunity does not bar his claims against New York State"). The decision to dismiss these claims was not a close call. Where a complaint has "no colorable basis in law or fact" and plaintiff's attorney should have known that, *Thomas v. Early Cnty.*, 518 F. App'x 645, 645 (11th Cir. 2013), Rule 11 sanctions are appropriate "to relieve the financial burden that baseless litigation imposes," *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1082 (7th Cir. 1987). *See* Fed. R. Civ. P. 11(b)(2) ("[A]n attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"). The Court declines to impose sanctions at this time but firmly discourages such pleading in the future.