IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| EDWIN CHARLES KRELL, | * | |
|---|---|---|
| Plaintiff, | * | |
| v. | * | CIVIL NO. JKB-18-637 |
| QUEEN ANNE'S COUNTY, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

This case arises out of the arrest of Edwin Krell ("Plaintiff") and his subsequent confinement at Queen Anne's County Detention Center ("QACDC"). In March 2018, Plaintiff filed a twelve-count complaint bringing federal and state law claims against numerous state and local officials, as well as Queen Anne's County. (Compl., ECF No. 1.) In December 2018, this Court dismissed several of these claims and parties, leaving two sets of defendants: (1) the warden of QACDC, LaMonte Cooke, and (2) two of the state troopers that arrested Plaintiff. (Memo. Op. Mot. Dismiss, ECF No. 27.)

Plaintiff brings his claims against Warden Cooke ("Defendant") under 42 U.S.C. § 1983. (Compl. ¶¶ 67, 95.) He alleges that Defendant was deliberately indifferent to his medical needs in violation of the Fourteenth Amendment (Count I) and the Eighth Amendment (Count III). (*Id.*) Discovery has been completed, and Defendant moves for summary judgment on both claims.[1] (M.S.J., ECF No. 51.) The motions have been fully briefed. No hearing is required. *See* Local

---

[1] The state troopers have also moved for summary judgment on each of the remaining claims against them. (ECF No. 58.) The Court addresses that motion in a separate memorandum.

1

Rule 105.6 (D. Md. 2016). For the reasons set forth below, the Court will grant Defendant's motion for summary judgment on both claims.[2]

## I. Factual Background

On March 3, 2015, Plaintiff was arrested on a felony drug charge by the Maryland State Police and brought to QACDC. (Krell Depo. 10:14–21, 96:7–12, ECF No. 69-1.) Plaintiff alleges he arrived at the facility with a right shoulder dislocation and a torn subscapularis tendon. (Opp'n Mem. at 3, ECF No. 68.) Despite a well-chronicled history of shoulder problems, Plaintiff attributes the injury to one of the arresting officers who allegedly pulled him up by the handcuffs during his arrest. (M.S.J. Ex. 5, ECF No. 53-4; Krell Depo. 106:9–13.) Defendant was made aware of Plaintiff's injury, in general terms, by a jail official during intake. (Cooke Depo. 23:4–6, ECF No. 69-2.)

On March 4, 2015, the day after Plaintiff arrived at the detention center, jail officials took him to a medical facility in Queenstown and then subsequently to the Shock Trauma Center at the University of Maryland Medical Center. (Krell Depo. 212:4–21.) While at Shock Trauma, Plaintiff was diagnosed with a dislocated shoulder and a closed reduction of the shoulder was performed. (Opp'n Mem. Ex. C at 1, ECF No. 69-3.) During this visit, a decision was reached that Plaintiff should have shoulder surgery. (*Id.* at 3.) The discharge instructions stated that Plaintiff should follow up with a surgeon—Dr. Gilotra—within one to two days to schedule an appointment for pre-operative surgical planning. (*Id.*) Plaintiff returned to QACDC but no appointment with Dr. Gilotra was ever scheduled. (Krell Depo. 218:15–21, 219:1–5.)

---

[2] Defendant also filed a motion to seal exhibits related to Plaintiff's medical records. (Mot. Seal, ECF No. 52.) The Court will grant this uncontested motion.

2

Plaintiff would ultimately spend one month at QACDC as a pretrial detainee. (M.S.J. Ex. 1 at 0007, ECF No. 53.)[3] During this time, he filed four Health Services Requests, which described severe pain and loss of mobility and sensation in his shoulder, arm and hand. (Opp'n Mem. Ex. F–I, ECF Nos. 69-6–69-9.) The requests were filed with Conmed—QACDC's third party medical provider—and each was acknowledged by Lona Ecker, an RN at the facility. (*Id.*; Cooke Depo. 26:4–7.) Plaintiff also filed one Inmate Request Form asking how his pain would be managed, but it is unclear which jail official received it. (Opp'n Mem. Ex. U, ECF No. 69-21.)

During his time at QACDC as a pretrial detainee, Plaintiff also had three additional appointments with medical providers. On March 8, 2015, Plaintiff was seen at Chester River Hospital Center for numerous complaints, including chest pain. (M.S.J. Ex. 1 at 0135–0142.) His shoulder was x-rayed at QACDC two days later. (*Id.* at 0206.) On March 18, 2015, Plaintiff saw an orthopedic surgeon—Dr. Stephen D. Brown—who ran further diagnostic studies on Plaintiff's shoulder and recommended a follow-up appointment "on or around" April 1, 2015. (Opp'n Mem. Ex. D at 4, ECF No. 69-4.) But on April 2, 2015, Plaintiff posted bail and was released from QACDC. (M.S.J. Ex. 1 at 0007.) Upon his release, Conmed provided Plaintiff written instructions to follow up with an orthopedic surgeon. (*Id.* at 0119–0122.)

Plaintiff subsequently pled guilty and returned to QACDC on November 6, 2015 to serve his sentence. (*Id.* at 0006; Krell Depo. 96:7–12.) During the time he had been outside of QACDC custody, Dr. Brown had performed surgery on Plaintiff's shoulder to repair what post-operative notes described as a "[m]assive Bankart tear subscapularis tendon rupture with retraction impingement." (Opp'n Mem. Ex. E at 1, ECF No. 69-5.) When Plaintiff returned to the detention center, his arm was in a metal brace, which jail officials confiscated. (Opp'n Mem. Ex. J., ECF

---

[3] The documents contained in Defendant's M.S.J. Exhibit 1 and Exhibit 8 are marked with Bates numbers instead of page numbers. (ECF Nos. 53, 53-8.) The Court will use the Bates numbers for clarity.

No. 69-10.) Plaintiff informed Defendant and Conmed staff that he needed physical therapy three times per week, though Conmed did not receive medical documentation supporting such a treatment plan nor any other medical records related to the surgery Dr. Brown performed. (M.S.J. Ex. 1; M.S.J. Mem. Supp. at 12, ECF No. 51-1.)

Plaintiff remained at QACDC until January 19, 2016. (M.S.J. Ex. 1 at 0001.) During this approximately two and one-half month period, Plaintiff attended two physical therapy appointments; he contends he should have been receiving physical therapy three times per week. (Opp'n Mem. Ex. K, ECF No. 69-11.) Plaintiff also attended a follow-up appointment with Dr. Brown on November 25, 2015. (M.S.J. Ex. 8 at G034–038, ECF No. 53-7.) Conmed staff occasionally supplied him with ice for his shoulder, but not as often as Plaintiff believed he needed. (Opp'n Mem. Ex. M, ECF. No. 69-13.)

During his time at QACDC as a post-conviction inmate, Plaintiff filed seven Inmate Grievances complaining of severe shoulder pain and expressing concern that his shoulder would be "messed up for life" if he did not get more frequent physical therapy. (Opp'n Mem. Ex. L–R, ECF Nos. 69-12–69-18.) Defendant signed and acknowledged each of these grievances. (*Id.*) Defendant was in regular contact with Conmed staff about getting Plaintiff physical therapy, and informed Plaintiff in writing of these efforts. (Cooke Depo. 118–131; Opp'n Mem. Ex. L–R.) Defendant speculated that the reason Conmed was having difficulty securing a physical therapist is that outside medical providers can be reluctant to treat inmates in their offices. (Cooke Depo. 127:1–9.) During this period, Defendant met frequently with Plaintiff to discuss his "medical situation," including up to "two or three times in one day." (*Id.* 39:10–19.)

Eventually Conmed staff approached Defendant about the possibility of Plaintiff serving the remainder of his sentence at home, where Plaintiff would have better access to physical

4

therapy. (*Id.* 44:2–8.) Defendant relayed this option to Plaintiff orally and in writing and suggested Plaintiff discuss the matter with his attorney. (M.S.J. Ex. 1 at 0041; Cooke Depo. 119:5–7.) Plaintiff's attorney eventually obtained the court's permission for Plaintiff to serve the remainder of his sentence on home detention, and Plaintiff was released from QACDC on January 19, 2016. (M.S.J. Ex. 1 at 0001.) Two years later, on March 2, 2018, Plaintiff filed his complaint. (Compl.)

## *II. Standards of Review*

### *A. Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the non-moving party, then a genuine dispute of material fact exists, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient. *Id.* at 252. The non-moving party may not rest upon the pleadings but instead must, by evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Where a genuine dispute exists, the facts and inferences derived therefrom must be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2009).

In this case, it is Defendant's burden to show that he is entitled to judgment as a matter of law, but Plaintiff has the burden of persuasion in establishing his constitutional claims. This means

5

that the Court views the evidence in the light most favorable to Plaintiff, but Plaintiff still must present enough evidence to show there is a genuine issue of material fact for trial.

## *B. Deliberate Indifference under the Fourteenth and Eighth Amendments*

Although deliberate indifference claims asserted by pretrial detainees arise under the Fourteenth Amendment, they are governed by the same deliberate indifference standard that governs Eighth Amendment claims by post-conviction inmates. *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). The analysis, therefore, as to whether Defendant was deliberately indifferent to Plaintiff's medical needs is the same whether the Court is considering his pretrial or his post-conviction claim.

To prevail on a deliberate indifference claim, a plaintiff must satisfy two requirements. First, the plaintiff must establish the "objective" component by illustrating a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976). A serious medical need is one that has "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Second, the plaintiff must establish the "subjective" component by showing deliberate indifference on the part of the defendant. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991). "Deliberate indifference" lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Establishing a defendant's "general knowledge of facts creating a substantial risk of harm is not enough" for a plaintiff to prevail on a deliberate indifference claim. *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). To be liable, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference." *Id.* at 837. Relief is reserved for cases in which the official's conduct is "egregious" and involves

an "unnecessary and wanton infliction of pain." *King v. United States*, 536 F. App'x 358, 364 (4th Cir. 2013) (quoting *Wilson*, 501 U.S. at 297).

## III. Analysis

### A. Deliberate Indifference Under the Fourteenth Amendment

Plaintiff's Fourteenth Amendment claim is based on the approximately one-month period he spent in QACDC as a pretrial detainee. Although Plaintiff may have had serious medical needs during this time, Plaintiff fails to raise a genuine dispute of material fact as to whether Defendant was deliberately indifferent to those needs.

Plaintiff was experiencing significant shoulder problems when he first arrived at QACDC. Within 48 hours of being admitted to the facility, Plaintiff was diagnosed with a dislocated shoulder, a shoulder reduction was performed, and a decision was reached to have follow-up surgery. (Opp'n Mem. Ex. C at 1.) Despite these indicia of a significant medical problem, Defendant nonetheless contends Plaintiff's injuries were not sufficiently serious, for two reasons: (1) Plaintiff could allegedly dislocate his shoulder "at will," and (2) Plaintiff had not heeded doctors' past recommendations to follow up with an orthopedist about surgically repairing his shoulder. (M.S.J. Mem. Supp. at 16.)

The Court is unpersuaded by Defendant's arguments. The "sufficiently serious" inquiry is an "objective" analysis into the seriousness of the injury while the plaintiff was under the care of the defendant. *See Estelle*, 429 U.S. at 105. Circumstances suggesting a plaintiff played a role in perpetuating an injury or could worsen it at will do not bear on whether the underlying injury was objectively serious. Here, Plaintiff's injury was "diagnosed by a physician as mandating treatment"—in this case, surgery—which is sufficient to satisfy the first prong in the deliberate indifference analysis. *See Scinto*, 841 F.3d at 225; *see also Oliver v. Pennsylvania Dep't of Corr.*,

No. Civ. No. TJS-13-5321, 2014 WL 80725, at *6 (E.D. Pa. Jan. 8, 2014) (citing cases where courts found shoulder pain and torn rotator cuffs were sufficiently serious injuries).

But even if Plaintiff's injury was sufficiently serious, his Fourteenth Amendment claim ultimately fails because no reasonable jury could conclude Defendant was deliberately indifferent to his medical needs. Plaintiff identifies only one instance in which Defendant was made aware of Plaintiff's shoulder problems: during intake, an officer told Defendant "something about [Plaintiff's] arm."[4] (Cooke Depo. 23:4–6). Plaintiff offers no evidence Defendant was aware of the circumstances surrounding the Shock Trauma visit (in which the need for surgery was discussed), the appointment with Dr. Brown (in which further tests were ordered), nor any of the complaints Plaintiff filed with Conmed staff (in which Plaintiff complained of severe shoulder pain). (Opp'n Mem. 8–15.)

At most, Plaintiff can only show that Defendant had a general awareness that his prisoner had a shoulder problem. But "general knowledge of facts creating a substantial risk of harm is not enough" for a plaintiff to prevail on a deliberate indifference claim. *Johnson*, 145 F.3d at 168. To be liable, a defendant must actually "draw the inference between those general facts and the specific risk of harm confronting the inmate." *Id.* There is no evidence in the record that Defendant drew such an inference, or even could have drawn such an inference, based on the limited information he had about Plaintiff's injury.

---

[4] In Plaintiff's deposition, Plaintiff alleged Defendant had far more knowledge about his injury than Plaintiff describes in the summary judgment briefing. For example, Plaintiff stated in his deposition that Defendant was present at Shock Trauma and heard that Plaintiff needed shoulder surgery. (Krell Depo. 214:12–16, 215:1–2.). Plaintiff also stated that Defendant overheard him during his bail review hearing telling the judge that he "really need[ed] medical help." (*Id.* at 208:2–13.) Defendant denies both assertions. (Cooke Aff. ¶¶ 5–6, ECF No. 53-3.) Because Plaintiff does not repeat these allegations in the summary judgment briefing, and there is no other evidence in the record related to these assertions, the Court assumes Plaintiff no longer makes these contentions and does not consider them in deciding whether there is a genuine dispute of material fact.

Perhaps cognizant of these evidentiary shortcomings, Plaintiff suggests Defendant is liable because as the warden of the jail, "the buck stop[ed] at [him]." (Opp'n Mem. at 14.) But deliberate indifference requires that a defendant be "personally involved" in the deprivation of a plaintiff's rights, not merely a supervisor in a facility where a plaintiff received inadequate medical care. *See Gordon v. Schilling*, No. 17-7298, 2019 WL 4179813, at *8 (4th Cir. Sept. 4, 2019) (concluding the plaintiff had sufficiently established a prison supervisor's personal involvement where the supervisor had "personally assented to the suspension of HCV treatment for all inmates"). Plaintiff offers no evidence of such personal involvement here.

Because no reasonable jury could conclude Defendant was deliberately indifferent to Plaintiff's medical needs during the pretrial period, the Court will grant Defendant's motion for summary judgment on Plaintiff's Fourteenth Amendment claim.

### B. Deliberate Indifference Under the Eighth Amendment

Plaintiff's Eighth Amendment claim is based on the approximately two and one-half months he spent in QACDC as a post-conviction inmate. Although Plaintiff may have had serious medical needs during this time, Plaintiff again fails to raise a genuine dispute of material fact as to whether Defendant was deliberately indifferent to those needs.

Plaintiff had already undergone surgery to repair his shoulder by the time he returned to QACDC to serve his sentence. (Opp'n Mem. Ex. E at 1.) But his need for medical treatment had not dissipated. According to Dr. Brown, after Plaintiff's surgery, he had "nerve damage as well as ligamentous instability" that required months if not years of physical therapy to "regain meaningful function" in his shoulder.[5] (M.S.J. Ex. 6, ECF No. 53-5.) Plaintiff, in other words,

---

[5] Dr. Brown made this statement in a letter addressed to Plaintiff's attorney, dated January 3, 2016. (M.S.J. Ex. 6, ECF No. 53-3.) Defendant asserts in passing that the Court should not consider this letter because it is inadmissible hearsay. (M.S.J. Mem. Supp. at 18 n.13.) Because Defendant has not articulated "the nature of the defects clearly and distinctly," the Court will consider the letter admissible for the sake of summary judgment. *See E.E.O.C. v.*

had an injury that had "been diagnosed by a physician as mandating treatment"—in this case, physical therapy—which is sufficient to satisfy the first prong in the deliberate indifference analysis. *See Scinto*, 841 F.3d at 225.

But even if his medical needs were sufficiently serious, no reasonable jury could conclude Defendant was deliberately indifferent to those needs during the post-conviction period. Defendant does not dispute that he was aware Plaintiff had shoulder problems during the time he was a post-conviction inmate. During this time, Plaintiff filed seven Inmate Grievances with Defendant complaining of severe shoulder pain and expressing concern that his shoulder would be "messed up for life" if he did not get more frequent physical therapy. (Opp'n Mem. Ex. L–R.) Defendant signed and acknowledged each of these grievances. (*Id.*) Defendant also readily concedes that during this period he met frequently with Plaintiff to discuss his "medical situation," including up to "two or three times in one day." (Cooke Depo. 39:10–19.)

But an official's knowledge of an injury does not alone establish deliberate indifference—a plaintiff must actually show the defendant was deliberately indifferent to those needs. *Farmer*, 511 U.S. at 844. Plaintiff's theory of liability appears to be that he needed physical therapy, Defendant knew he needed physical therapy, and because Plaintiff did not receive adequate physical therapy, Defendant is liable for deliberate indifference. (Opp'n Mem. at 16–20.) But this theory includes no examples of deliberate action or inaction on the part of Defendant.

In fact, the record suggests Defendant was fairly responsive to Plaintiff's needs. In response to at least five of the seven Inmate Grievances that Plaintiff filed, Defendant included a written response informing Plaintiff that he had discussed the matter with Conmed, and they were

---

*Denny's, Inc.*, Civ. No. WDQ-06-2527, 2010 WL 2817109, at *3 (D. Md. July 16, 2010). The Court notes, however, that Defendant did not see this letter until the discovery phase of this lawsuit, and as such, the letter is not probative of the extent to which Defendant was aware of Plaintiff's medical needs during the time he was at QACDC. (M.S.J. Mem. Supp. at 5 n.9.)

still working on finding a willing physical therapist. (Opp'n Mem. Ex. L–R.) Defendant also testified that he had additional "informal conversations" with Conmed staff beyond those described in the grievances about the status of Plaintiff's physical therapy. (Cooke Depo. 126:15–21.) And in the end, it was Defendant who approached Plaintiff to suggest he seek to serve the remainder of his sentence at home, so he could get better access to physical therapy, which Plaintiff ultimately did.[6] (M.S.J. Ex. 1 at 0041, 0001; Cooke Depo. 119:5–7.) Defendant may not have addressed the matter with as much urgency as Plaintiff wanted, but Plaintiff does not dispute that Defendant monitored the situation, regularly followed up with Conmed about it, and in the end, was the one who suggested the solution to the problem—serving the rest of his sentence on home detention.

Plaintiff may very well have received inadequate medical treatment while he was a post-conviction inmate. He attended just two physical therapy appointments even though he was recovering from major shoulder surgery. (Opp'n Mem. Ex. K.) But where an official responds to an inmate's medical needs "reasonably," he is free from liability, "even if the harm ultimately [is] not averted." *See Farmer*, 511 U.S. at 844. Instead, relief is reserved for cases where the defendant's conduct was "egregious" and involved an "unnecessary and wanton infliction of pain," and no reasonable jury could conclude Defendant's conduct here reached this high bar. *See King*, 536 F. App'x at 364. As such, the Court will grant Defendant's motion for summary judgment on Plaintiff's Eighth Amendment claim.

## IV. *Conclusion*

---

[6] Beyond Plaintiff's general complaints about his lack of access to physical therapy, Plaintiff describes only one concrete example of deliberate indifference by a jail official during this period: upon his arrival at QACDC as a post-conviction inmate, a jail official confiscated the metal brace on his arm. (Opp'n Mem. Ex. J.) But Plaintiff does not allege that Defendant was involved in this incident or even had knowledge of it. (Opp'n Mem. at 20.)

11

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment on both the Fourteenth and Eighth Amendment claims.

DATED this 3 day of October, 2019.

BY THE COURT:

James K. Bredar
Chief Judge